IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 13-cv-01853-RBJ

TEVA M. EVANS,

     Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

     Defendant.

---

## ORDER

---

In this case, Ms. Teva Evans challenges the decision of the Commissioner of Social Security to deny her application for Supplemental Security Income ("SSI") pursuant to Title II of the Social Security Act ("Act").  Jurisdiction is proper under 42 U.S.C. § 405(g).

## I.    <u>Factual Background</u>

This is Ms. Evans's second time before this Court in this matter.  In 2012 I remanded her case to the Commissioner in light of several legal deficiencies, none of which appear to be directly relevant to Ms. Evans's second appeal.  *Evans v. Astrue*, No. 10-cv-1579-RBJ, 855 F. Supp. 2d 1231 (D. Colo. Jan. 3, 2012).  Because that earlier order contains several pages summarizing Ms. Evans's medical history, I incorporate it by reference.  My discussion of the facts in this order focuses more narrowly on new facts and those facts that are directly relevant to the parties' arguments in this appeal.

### a.  Medical Background

In 2006, Ms. Evans visited Valley Wide Clinic in connection with her disability application.  R. 425.  She complained of Wolff-Parkinson White Syndrome (a type of arrhythmia) and also of knee pain.  R. 465.  Her treating physician at Valley Wide, Dr. Jason Morgenson, opined that Ms. Evans would be disabled for less than a year due to her torn meniscus and a learning disability.  R. 465-66.  He also concluded that her arrhythmia was well-controlled with medication.  R. 548.  A follow up visit in 2008 revealed that Ms. Evans's tachycardia was actually well-controlled despite the fact that Ms. Evans was non-compliant with her medication.  R. 543.

In January 2007, Ms. Evans received treatment from Dr. Velma Campbell.  Dr. Campbell opined that Ms. Evans could walk and stand for less than four hours per day, and that Ms. Evans's tachycardia would be dangerous even if it was well-controlled.  She recommended that Ms. Evans avoid physical and psychological stress.  R. 256.

In March and April 2008, Ms. Evans fractured a bone in her foot.  R. 502-06, 540.  Her treatment providers put her in a cast, but Ms. Evans removed her cast before the foot had fully healed, leading to a "non-union" of the fracture.  R. 518.

In May 2008, Dr. William Morton, Psy.D., examined Ms. Evans in connection with her disability application.  Dr. Morton's tests revealed that Ms. Evans was in the borderline intellectual range and displayed symptoms of severe and recurrent depression, adjustment disorder, and borderline intellectual functioning.  R. 481.  He concluded that Ms. Evans would have no problems understanding and remembering simple and complex instructions but would have moderate limitations carrying out simple instructions and marked difficulty carrying out

complex ones.  R. 483.  He also noted mild social limitations.  R. 484.  The form Dr. Morton filled out defined "moderate" as "more than a slight limitation in this area, but the individual is still able to function satisfactorily."  *Id.*

In November of 2008, Ms. Evans was treated by Dr. Jeffrey Perry for an ectopic pregnancy.  Dr. Perry endorsed restrictions on Ms. Evans's abilities that were somewhat more limiting than other opinions contained in the record.  Specifically, Dr. Perry opined that Ms. Evans is unable to sit, stand, or walk for more than thirty minutes at a time and that she could stand and walk for no more than two hours per day.  R. 564.  He also noted that her depression would cause frequent absences from work.  R. 565.

After this Court remanded the case following Ms. Evans's first appeal, the Commissioner required her to undergo two additional examinations.  Dr. Campbell reexamined Ms. Evans.  R. 892-901.  She diagnosed several conditions—all of which are noted elsewhere in Ms. Evans's medical history—including tachycardia, knee and foot pain, seizure disorder, and migraines.  R. 894.  She again limited Ms. Evans to standing or walking two hours in a day, but she imposed no restrictions on Ms. Evans's ability to sit.  She suggested that Ms. Evans's back pain might require the ability to change positions frequently.  R. 895.

Next, Ms. Evans was examined by Dr. Terry Jones, a psychiatrist, who diagnosed moderate borderline personality disorder causing mild limitations in understanding and memory and mild to moderate limitations in social interactions, concentration, persistence, and pace.  R. 887.  In light of these limitations, Dr. Jones suggested that Ms. Evans seek a job that would allow her to take frequent breaks if necessary.  *Id.*

### b.  Procedural Background

The ALJ (E. William Shaffer) held a second (post-remand) hearing on Ms. Evans's claims on September 24, 2012.  Several individuals testified.  First, the ALJ heard from Dr. Anne Winkler, a consulting physician who is board certified in internal medicine and rheumatology. R. 650.  Dr. Winkler opined that Ms. Evans suffered from mild hearing loss, a torn left meniscus (although she noted that it might not be an ongoing problem), obesity, headaches, seizures, a healed foot-fracture, a type of arrhythmia called Wolff-Parkinson White Syndrome (which she noted had only manifest itself in one problematic episode), and mild arthritis.  R. 652-53.  She suggested that Ms. Evans should be limited to two hours of standing and two hours of walking per day, assuming the meniscus injury was still present.  R. 655. 663.  In response to a question from Ms. Evans's attorney, she indicated that Ms. Evans should be limited to standing or walking fifteen minutes at a time.  R. 662.  She imposed no limits on Ms. Evans's ability to sit.

The ALJ then heard from Dr. Robert Pelc, a consulting psychologist, who opined that Ms. Evans had a learning disorder, an affective disorder, and a history of polysubstance dependence.  R. 669-70.  He recommended occasional interaction with coworkers, supervisors, and the general public and opined that Ms. Evans could understand, remember, and carry out simple instructions.  R. 671-73.

Finally, the ALJ heard from Nora Dunn, a vocational expert ("VE").  The ALJ posed a set of hypothetical limitations to the VE and asked her to testify about the existence of jobs available to someone with those hypothetical limitations.  Initially, the ALJ inquired about an individual with Ms. Evans's work history who could function at the light exertional level, but who was limited to standing and walking for no more than two hours each in a day.  R. 687-88. Additionally, this hypothetical included other postural limitations, environmental limitations,

4

and, particularly relevant to this appeal, a limitation to the unskilled level with decreased

interpersonal contact.  R. 688.  The ALJ included no other limitations on mental capacity.  The

VE responded that such a person could work as a silverware wrapper, document preparer, or

surveillance system monitor.  R. 689.  The ALJ then posed a second hypothetical.  This one also

limited the individual to standing and walking to no more than four total hours in a day, but

included several new limitations including "moderate limitations in the ability to sustain

concentration, focus, and attention."  R. 690.  The transcript of the hearing, however, suggests

that the VE never actually responded to these additional limitations on concentration.  *See* R.

690-93, 694-97.[1]

 The ALJ issued an unfavorable opinion on October 30, 2012 after evaluating all of the

evidence according to the Social Security Administration's standard five-step process.  R. 622-

45.  At step one, the ALJ determined that Ms. Evans had not engaged in substantial gainful

activity since her application for disability.  He went on to identify the following severe

impairments at step two: "a history of a meniscal tear of the left knee; status-post fracture of the

fifth metatarsal (ray) in the left foot; mild hearing loss; obesity; a seizure disorder vs.

pseudoseizures; learning, affective, anxiety and personality disorders."  R. 628.  At step three,

the ALJ concluded that none of these impairments, singly or in combination, met or medically

equaled a listed impairment.  R. 629.  He then determined Ms. Evans's residual functional

capacity ("RFC") as follows:

> [C]laimant has the residual functional capacity to perform light work as defined in
> 20 CFR 416.967(b) except that she can stand or walk for two hours, and sit for six

---

[1] The VE's response to the second hypothetical is limited to the effect of more stringent restrictions on Ms. Evans's ability to stand and walk (which appears to be a response to the first hypothetical) and to the issue of whether the job of order clerk would accommodate the second hypothetical.

> hours, during an eight-hour workday; she should push or pull occasionally when using the left lower extremity; there should be no climbing of ladders, ropes or scaffolds and occasional climbing of stairs and ramps, balancing, stooping, kneeling, crouching or crawling; she should avoid concentrated exposure to extreme heat and a high noise environment, and all exposure to unprotected heights and major manufacturing machinery; the work should be performed at the unskilled level, and she should have occasional interactions with others.

R. 632.

The ALJ settled upon this RFC after weighing all of the medical evidence before him. As relevant to this appeal, the ALJ gave some weight to the various opinions regarding Ms. Evans's knee and foot problems. But he noted the mixed clinical evidence of impairments related to these issues. In particular, he pointed to a 2008 x-ray demonstrating that Ms. Evans's foot fracture had healed and several instances where her ability to stand and walk appeared unencumbered. R. 633.

Dr. Campbell's 2007 opinion that Ms. Evans should stand or walk no more than four hours per day received great weight. R. 637. At the same time, the ALJ went beyond Dr. Campbell's opinion and suggested that Ms. Evans's "complaints of left foot pain . . . would require additional accommodation." R. 638. Dr. Campbell's later 2012 opinion received "little weight" given inconsistencies with the record and lack of substantiation. R. 639.

The ALJ declined to give Dr. Perry's opinion controlling weight due to apparent inconsistencies with the rest of the medical record, particularly on the issues of limiting Ms. Evans to no more than 30 minutes of walking, sitting, or standing at a time as well as the possibility that her depression would force her to be absent from work several days per week. He nonetheless gave "partial weight" to that opinion insofar as it imposed some standing, walking, and postural limitations consistent with evidence of Ms. Evans's exams. *Id.*

Turning to Dr. Winkler's hearing testimony, the ALJ noted that Dr. Winkler had the opportunity to review all of the medical records in the case.  R. 640.  This fact, coupled with what the ALJ believed to be "well-substantiated" conclusions led the ALJ to give "[g]reat weight" to Dr. Winkler's analysis.  *Id.*  That said, the ALJ discounted Dr. Winkler's opinion that Ms. Evans could stand and walk for no more than fifteen minutes at a time because that conclusion was inconsistent with the rest of the record which indicated only intermittent gait changes, excellent lower extremity strength, and no muscle atrophy.  *Id.*

Regarding evidence of Ms. Evans's mental limitations, the ALJ gave great weight to the opinion of Dr. Morton.  R. 641.  In fact he went even further and, in light of her difficulties with PTSD, concluded that "her degree of limitation in social functioning and in maintaining focus and concentration is somewhat more severe."  *Id.*  The ALJ gave great weight to Dr. Jones's opinion that Ms. Evans is "capable of performing simple tasks with some consideration for difficulties with social interactions."  R. 642.  Yet to the extent that Dr. Jones's opinion suggested she would require additional accommodation to do even simple repetitive tasks, the ALJ concluded that these opinions were undercut by Dr. Jones's own treatment notes.  Finally, the ALJ gave great weight to the opinions of consulting psychologist Dr. Pelc who opined that Ms. Evans "retained the capacity to understand, remember and carryout simple instructions, make judgments commensurate with the functioning of simple . . . jobs, and responding appropriately in simple work setting [sic]."  *Id.*

Because Ms. Evans has no past relevant work, the ALJ proceeded to step five of his analysis.  Finding that her RFC eroded her ability to perform certain jobs in the "light work" category, the ALJ turned to the VE for evidence of jobs available to Ms. Evans.  The ALJ relied

7

on the VE's testimony that Ms. Evans would be able to perform the jobs of silverware wrapper, documents preparer, and surveillance system monitor.  R. 644.  Based on this information, the ALJ concluded that Ms. Evans "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and found her not disabled for purposes of the Act.  R. 645.

The Appeals Council declined jurisdiction, at which point the ALJ's opinion became the final administrative decision of the Commissioner.  Ms. Evans timely appealed that decision to this Court.

## II.   <u>Analysis</u>

### a.   <u>Standard of Review.</u>

This appeal is based upon the administrative record and briefs submitted by the parties. In reviewing a final decision by the Commissioner, the role of the District Court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998).  A decision cannot be based on substantial evidence if "it is overwhelmed by other evidence in the record. . . ." *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988).  Substantial evidence requires "more than a scintilla, but less than a preponderance."  *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).  Evidence is not substantial if it "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

### b.   <u>The ALJ Properly Evaluated Ms. Evans's Ability to Walk and Stand.</u>

Ms. Evans initially—in her opening brief—argued that the ALJ erred in concluding that Ms. Evans was capable of standing or walking for four hours in a workday. However the ALJ actually concluded that Ms. Evans was capable of standing or walking for two hours total in a workday. R. 632. Therefore, as Ms. Evans concedes in her reply brief, she has no objection to the ALJ's conclusion regarding her ability to stand and walk. ECF No. 17 at 1-2.

Ms. Evans maintains that the ALJ nonetheless committed reversible error by finding that she is capable of performing the job of silverware wrapper despite this two-hour limitation. *Id.* at 2. The Commissioner agrees that the ALJ erred but contends that any error was harmless. ECF No. 16 at 14-15. Both the Commissioner and Ms. Evans agree that she is capable of performing the other two sedentary jobs relied upon by the ALJ: document preparer and surveillance system monitor—18,000 jobs in the national economy and 272 in the region. R. 644. While the Commissioner suggests these remaining jobs exist in significant numbers to preclude a finding of disability, Ms. Evans asks for a remand in order to let the ALJ make such a determination. While this appears to be a rather common occurrence in Social Security cases, the precedent from this circuit is less than crystal clear about how to deal with such an error.

A harmless error analysis, generally disfavored in administrative appeals, may at times be appropriate where an ALJ erroneously concludes that a claimant could perform certain jobs in the regional or national economy. *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). Deciding when a harmless error analysis is appropriate, however, is a tougher task. There is no bright line rule establishing how many jobs are a sufficient number of jobs for purposes of the Act. *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992) ("This Circuit has never drawn a bright line establishing the number of jobs necessary to constitute a 'significant number' and

rejects the opportunity to do so here.").  Rather the *Trimiar* court provided a non-exhaustive list

of factors to consider in determining whether work exists in significant numbers: "the level of

claimant's disability; the reliability of the vocational expert's testimony; the distance claimant is

capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and

availability of such work, and so on."  *Id.* (quoting *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th

Cir.1988)).

The *Trimiar* court never used the phrase "harmless error," but later Tenth Circuit cases

interpreting *Trimiar* make it clear that *Trimiar* is a harmless error case.

> [I]t nevertheless may be appropriate to supply a missing dispositive finding under
> the rubric of harmless error in the right exceptional circumstance, i.e., where,
> based on material the ALJ did at least consider (just not properly), we could
> confidently say that no reasonable administrative factfinder, following the correct
> analysis, could have resolved the factual matter in any other way. Such an
> approach might have been open to us here had the number of available jobs
> identified by the VE not been one hundred but considerably greater.  In *Trimiar,*
> we explicitly addressed an ALJ's finding of numerical significance with respect to
> an occupation reflecting 650–900 statewide jobs, indicating that such a number
> was small enough to put the issue in a gray area requiring the ALJ to address it
> and us to review what he or she decided. *See Trimiar,* 966 F.2d at 1330. As the
> number in this case is even lower, excusing the ALJ's failure to assess it in
> connection with the *Trimiar* factors would be an improper exercise in judicial
> factfinding rather than a proper application of harmless-error principles.

*Allen*, 357 F.3d at 1145.

The Tenth Circuit later clarified that what matters for purposes of the Act is the number

of jobs in the regional *or national* economy.  *Raymond v. Astrue*, 621 F.3d 1269, 1274 n.2 (10th

Cir. 2009).  In *Raymond*, only 385 regional jobs were available—even fewer than the number in

*Trimiar*.  However the *Raymond* court distinguished *Trimiar* by pointing to the 1.34 million jobs

available to Mr. Raymond in the national economy and concluding that such a large number of

jobs obviated the need for a remand for an explicit analysis of the factors enunciated in *Trimiar*. *Id.*

So where does that leave us?  Apparently the courts should be wary of applying a harmless error analysis in this context unless the number of jobs available in the regional or national economy is quite large and no reasonable fact-finder could reach a different conclusion or unless the ALJ engaged in an analysis of the *Trimiar* factors in such a way that assures the reviewing court that the ALJ made a finding of fact about the sufficiency of the number of jobs in the economy.  Here there is no discussion of the *Trimiar* factors, and the number of jobs is far lower than the 1.34 million jobs in *Raymond*.  Ms. Evans offers the unpublished case of *Chavez v. Barnhart*, 126 F. App'x 434, 436 (10th Cir. 2005), the facts of which appear almost identical to those in the instant case.  In *Chavez*, the ALJ erroneously included jobs that the claimant was unable to perform.  *Id.*  The remaining job—parking lot attendant—presented 199 jobs in the region and 49,957 jobs in the nation.  *Id.*  Looking at these numbers, the court could not say that no reasonable ALJ could have concluded that this number was so low as to direct a finding of disability and therefore remanded the case.  *Id.*

In light of these cases, I cannot hold that as a matter of law 18,000 jobs in the national economy is so significant that no reasonable fact-finder could reach the opposite conclusion.[2]  To be sure, *Allen* leaves open the possibility that with larger numbers of jobs than those in *Trimiar*, a harmless error analysis may be appropriate, and in this case there are more jobs available than

---

[2]  The Commissioner has pointed to at least one case where a smaller number of jobs in the national economy constituted sufficient numbers.  *Rogers v. Astrue*, 312 F. App'x 138, 142 (10th Cir. 2009) (unpublished) (dicta indicating 11,000 jobs in the national economy is sufficient).  In that case, however, the court was not applying a harmless error analysis and was not being asked to determine whether 11,000 jobs, in the absence of consideration by the ALJ, constituted sufficient numbers.  Therefore I cannot in good conscience rely on that case to reach the conclusion that a remand is unnecessary here.

the 650 regional jobs in *Trimiar*.  However in this case, we do not even remotely approach the 1.34 million jobs that triggered a harmless error analysis in *Raymond*.  That reality, coupled with the fact that *Chavez* appears to be on all-fours with this case counsels against application of the harmless error doctrine.  While I would not be surprised if the ALJ determines that 18,000 jobs in the national economy is sufficient under the Act, that decision is for him to make, not for this Court.

### c.   The ALJ's Treatment of Ms. Evans's Tachycardia Is Supported by Substantial Evidence.

Ms. Evans argues that the ALJ failed to properly account for the limitations that Dr. Campbell identified related to tachycardia.  Because Dr. Campbell found that Ms. Evans's tachycardia could be incapacitating, and because the ALJ gave Dr. Campbell's opinion great weight, Ms. Evans believes the ALJ ought to have found the tachycardia to be a severe impairment and analyzed it accordingly.  I disagree and can find no error in the ALJ's treatment of the issue.

Dr. Campbell's exact words regarding Ms. Evans's tachycardia were that it "is incapacitating and can be dangerous when present."  R. 256.  But where the rubber meets the road here is how Dr. Campbell envisioned this tachycardia affecting Ms. Evans in a functional sense.  In that regard, Dr. Campbell recommended that Ms. Evans avoid "strenuous exertion and exposure to psychological stressors."  R. 256.  The ALJ's RFC is entirely consistent with these limitations, a fact that Ms. Evans has not disputed in her appeal.  If there were any lingering doubts about the seriousness of Ms. Evans's tachycardia, her other doctors have reported that her condition is well controlled both on and off medication. R. 543, 548.  There is no inconsistency

between Dr. Campbell's opinion and the ALJ's RFC, and therefore there is no error in the Commissioner's decision.

### d.   The ALJ Properly Weighed the Opinions of Dr. Perry and Dr. Winkler.

Ms. Evans believes the ALJ improperly subordinated the opinion of her treating physician, Dr. Perry, to that of a non-examining physician, Dr. Winkler.  Again, I disagree.

Ms. Evans is right that the ALJ's analysis of a treating physician's opinion is a two-step process.  First, the ALJ must determine whether the treating physician opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the record]."  20 C.F.R. 416.927(c)(2).  However, even if the treating physician's opinion fails this first test, the opinion is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting Social Security Ruling 96-2p).  Among others, those factors include the length of the treatment relationship, the nature and extent of that relationship, the degree to which the opinion is supported by other evidence, and the consistency between the opinion and the record as a whole.  *Id.*  "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

In this case, the ALJ followed the *Watkins* framework to the letter.  The ALJ noted several inconsistencies between Dr. Perry's opinion and the rest of the record.  For example, Dr. Perry opined that Ms. Evans could lift and carry only five pounds, yet the record reveals full strength in her upper extremities.  R. 256, 894.  Furthermore, whereas Dr. Perry limited Ms.

Evans to sitting, standing, and walking no more than thirty minutes at a time, the record is replete

with evidence of her being able to sit comfortably for extended periods of time.  R. 255, 894.  20

C.F.R. 416.927(c)(3) ("The more a medical source presents relevant evidence to support an

opinion, particularly medical signs and laboratory findings, the more weight we will give that

opinion."); *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987) ("We have suggested that a

treating physician's opinion might be rejected if it is brief, conclusory, and unsupported by

medical evidence, but we have emphasized that if the opinion of the claimant's physician is to be

disregarded, specific, legitimate reasons for this action must be set forth.") (internal citations and

quotation marks omitted).  These inconsistencies alone could justifiably deprive Dr. Perry's

opinion of controlling weight.

The ALJ went on to identify additional reasons to give Dr. Perry's opinion less weight

than Dr. Winkler's opinion despite the general rule that Dr. Perry, as a treating physician, would

receive greater weight.  These reasons dovetail with the factors set out by 20 C.F.R. 416.927(c).

First, the ALJ noted that Dr. Perry's relationship with Ms. Evans was brief and largely

directed toward treating a condition unrelated to her functional limitations.  R. 638.  Prior to his

2008 opinion, Dr. Perry saw Ms. Evans only a few times, and his treatment related primarily to

her ectopic pregnancy and other issues not directly relevant to the impairments alleged in this

appeal.  R. 524-25, 554, 556.

Second, the ALJ pointed out that Dr. Perry did not have the opportunity to review the

almost four years of additional medical records that Dr. Winkler had at her disposal.

Significantly, those later records undercut much of the justification for Dr. Perry's rather

restrictive opinion.  R. 652-53 (no ongoing tachycardia issues), 658 (x-ray demonstrating healed

foot); 659 (x-ray ruling out major spine problems).  Dr. Perry's conclusions relied upon outdated medical information with respect to each of these maladies.  R. 563.

Ms. Evans is correct that the general rule is that a non-examining physician's assessment of the record is usually not enough to elevate that assessment over a treating physician's assessment.  *See Allison v. Heckler*, 711 F.2d 145 (10th Cir. 1983).  That rule is nothing more than a general rule, however, and this case is an unsurprising exception.  The ALJ offered a litany of reasons why Dr. Winkler's opinion was entitled to greater weight than Dr. Perry's.  Indeed, the substantial evidence in the record supports the ALJ's analysis here.  It would require a great deal of counter-intuitive reasoning to give Dr. Perry's opinion greater weight than Dr. Winkler's newer, more consistent, and better-supported opinion.

### e.   The ALJ's Decision to Discount Dr. Winkler's Opinion about Standing and Walking is Supported by Substantial Evidence.

Ms. Evans argues that the ALJ should not have rejected Dr. Winkler's opinion that Ms. Evans is unable to stand for more than fifteen minutes at a time.  Specifically she argues that Dr. Winkler's opinion was based upon all of the medical evidence in the record and in reaching a contrary conclusion the ALJ improperly substituted his own lay opinion for that of the medical examiner.  *Cf. Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007).

I am persuaded by neither of these points.  Every non-examining physician's opinion is based upon all of the medical evidence in the record—that is simply another way of describing the role of a non-examining physician.  Yet an ALJ need not adopt any opinion wholesale.  *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion

on the functional capacity in question."). While the ALJ must account for medical opinions in evidence, the precise question of Ms. Evans's functional limitations was an administrative determination to be made by the ALJ. 20 C.F.R. § 416.927(d).

Here, the ALJ gave a reason for rejecting this portion of Dr. Winkler's opinion, notwithstanding the fact that he gave her opinion great weight generally. That reason was that Dr. Winkler's opinion assumed that Ms. Evans had on-going knee issues. R. 640, 633, 659-60, 662. Yet as the record demonstrates, there was evidence that Ms. Evans's knee issues were resolved or at least not limiting her to the extent that she claimed. R. 254 (reporting that walking a mile causes "some pain in the knee"), 255 (noting that Ms. Evans moves around the exam room without help or support), 894 (same), 1028 (noting normal posture and gait). Such an inconsistency is a legitimate reason for an ALJ to discount an opinion. 20 C.F.R. § 416.927(c)(4).

f. **The ALJ's Treatment of Ms. Evans's Mental Impairments Is Supported by Substantial Evidence.**

Ms. Evans objects to the ALJ's analysis of her mental limitations in the RFC. Ms. Evans contends that because the ALJ determined that her impairments in concentration and focus are more severe than Dr. Morton indicated, the RFC should have been more restrictive.

The parties' briefs on this topic are dizzyingly semantic. Boiled down to its essentials, the dispute is about whether the ALJ's decision to limit Ms. Evans to unskilled work gave sufficient consideration of her mental impairments, or whether the ALJ was required to pose those specific impairments to the VE who would have then testified about what sorts of jobs might be available to a similarly situated claimant.

16

In support of her position, Ms. Evans cites *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) ("Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the [Commissioner's] decision.").  She also points the Court to a footnote in *Chapo v. Astrue*, 682 F.3d 1285, 1290 n.3 (10th Cir. 2012).  In *Chapo*, the court remanded a case in which the ALJ failed to evaluate properly a treating physician's opinion.  In what appears to be dicta, the court explained that a restriction to a lower skill level of work "account[s] for issues of skill transfer, not impairment of mental functions—which 'are not skills but, rather, general prerequisites for most work at any skill level.'"  *Id.* (quoting *Wayland v. Chater*, Nos. 95–7029 and 95–7059, 1996 WL 50459, at *2 (10th Cir. Feb. 7, 1996) (unpublished)).[3]  Ms. Evans cites *Wayland* as well, noting that "the tacit premise . . . that a cognitive or emotional impairment may be functionally equated with the lack of a skill, as that term is employed in the [Commissioner's] regulations, is wrong." *Wayland*, 1996 WL 50459, at *2.

In response, the Commissioner brushes off Ms. Evans's reliance on *Chapo* as dicta quoting an unpublished case.  The Commissioner also notes that the Social Security regulations themselves account for more than just skills and education in their definitions of various types of work.  *See, e.g.*, 20 C.F.R. § 416.968(b) (distinguishing skilled and unskilled work based on the level of complexity involved).

Even if the footnote from *Chapo* is dicta, I find it—and the rationale from *Wayland*— persuasive.  There may be situations where a mental limitation can be "so obviously

---

[3] The statement is dicta because the court made it clear that regardless of the possible disconnect between mental impairments and skill levels, "the failure of the ALJ to include his own mental restriction would be fatal to the validity of the hypothetical to the VE." *Id.*

accommodated by a reduction in skill level" that the ALJ need not elicit detailed vocational testimony on the topic. *Wayland*, 1996 WL 50459, at *2.  The relationship between moderate limitations in concentration and unskilled work, however, is not so obvious, at least in this case. On remand, the ALJ should also make sure to include these limitations in his hypothetical to the VE.[4]

Relatedly, Ms. Evans also objects to the ALJ's rejecting Dr. Jones's opinion that Ms. Evans would struggle with being consistent and productive at work and would likely need a job where she could take frequent breaks.  The ALJ's stated justification for rejecting this opinion is that it is inconsistent with Dr. Jones's own treating notes that indicated Ms. Evans did "relatively well" and "apparently was fairly successful" in other jobs with only minor issues with other people.  R. 883.  Such an inconsistency is a permissible reason for an ALJ to discount a medical opinion.  20 C.F.R. § 416.927(c)(4).

Ms. Evans counters that rather than being internally contradictory, Dr. Jones's opinion was *based* upon his observations about her work history and therefore must have accounted for those observations.  Furthermore, she argues that her lifetime work history of earning $362.76 hardly constitutes a successful work history sufficient to reject Dr. Jones's opinion.  R. 165.

The fact that Dr. Jones was aware of his notes when he opined about Ms. Evans's limitations does not resolve the inconsistency.  If that were the case, as the Commissioner correctly suggests, then no doctor could ever be inconsistent in his or her opinion, and the regulation directing ALJs to analyze such inconsistencies would be meaningless.  Ms. Evans has

---

[4] I note that the transcript of the hearing appears to contain a brief discussion of these mental limitations between the ALJ and the VE.  R. 690-92.  However, the dialog is jumbled enough that the Court does not feel comfortable concluding that the VE evaluated these limitations.  What is more, the Commissioner has not argued in this appeal that the ALJ *did in fact pose* these limitations to the VE.

18

a point—that the ALJ appears to have ignored or at least minimized the fact that her work history is so sparse that it might not be a reliable source of information about her ability to work. That said, the ALJ had more than a scintilla of evidence at his disposal when he identified this inconsistency and decided to discount Dr. Jones's opinion, and this Court will not reweigh the evidence.

Finally, I agree with the Commissioner that Ms. Evans's objection to the ALJ's analysis of Dr. Pelc's opinion is completely undeveloped and therefore waived. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012).

### III.   Conclusion

Therefore, the decision of the Commissioner is REVERSED and REMANDED for further findings. On remand, the ALJ must determine whether the number of jobs Ms. Evans can perform constitutes significant numbers of employment for purposes of the Act and must pose to the VE any mental limitations he opts to include in Ms. Evans's RFC. While I ultimately conclude that the case must go back to the ALJ again, I note that I have in most respects agreed with his analysis, and I appreciate the diligence he has displayed in his consideration of the case.

DATED this 6th day of August, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

19